### In re O'BRIEN.

(Supreme Court, Appellate Division, First Department. May 12, 1916.)

ATTORNEY AND CLIENT ⬅️44(2)—DISBARMENT—OBTAINING CLIENT'S MONEY.

  Respondent, an attorney at law, who, while acting as attorney for one who had been arrested on a complaint of disorderly conduct, received a fee of $25, and while the client was in jail on bail fixed at $500, subsequently reduced to $300, through misrepresentation and deceit obtained his bank book, showing deposits of $820, and a blank withdrawal slip, withdrew $700, deposited $300 as bail, and after the client pleaded guilty and had been fined $10 obtained the client's indorsement to the city chamberlain's check for the $300 and received the proceeds on it, and whose associate in the same way obtained the deposit balance of $120, of which $115 was returned to the client, and who attempted to induce the client to leave the jurisdiction, was guilty of gross professional misconduct, and would be disbarred.

  [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 56; Dec. Dig. ⬅️44(2).]

Application on the report of the official referee upon charges against Stephen O'Brien, an attorney and counselor at law for professional misconduct. Respondent disbarred.

Argued before CLARKE, P. J., and LAUGHLIN, PAGE, and DAVIS, JJ.

Einar Chrystie, of New York City (Isidor J. Kresel, of New York City, of counsel), for petitioner.
Stephen O'Brien, of New York City, pro se.

CLARKE, P. J. This is the usual disciplinary proceeding instituted by the Association of the Bar of the City of New York against the respondent, an attorney and counselor at law, who was admitted to practice in the state of New York in November, 1900.

The charge of professional misconduct is that, while acting as attorney for one William McKenna, who had been arrested on a complaint of disorderly conduct, consisting of indecent exposure, he obtained McKenna's bank book and money order, and upon them he improperly and without authority withdrew $700 from the bank, and then claimed and retained a sum for his fee which was outrageously large, in view of the character of the services performed and of the circumstances connected with the case. The facts, as found by the learned official referee, and upon which he has found that the charge

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of gross professional misconduct, as made in the petition, has been fully established, in brief are as follows:

That McKenna came to this country from Ireland. That after having spent about 4 years and 7 months here he returned to Ireland, and then came back to the United States in October, 1914. During the period referred to he had worked as a conductor on the Third Avenue Railroad, and had saved about $820, which he had deposited in the Union Dime Savings Bank. On Saturday, March 13, 1915, he was arrested, charged with disorderly conduct, consisting of indecent exposure, and locked up in the Fifty-Fourth Street jail. He gave a friend named McHugh $25 to get him a lawyer, and he was informed by McHugh that he had engaged the respondent. On Monday, March 15th, McKenna was again arraigned, and the respondent appeared and requested an adjournment until March 18th. This request was granted, and the bail was fixed at $500, and McKenna was remanded to jail. While there the respondent called and had a conversation with him, in the course of which McKenna asked him whether his bank book would be good as bail. The respondent said it would. McKenna said, if the money had to be taken out of the bank, he would rather remain in prison for a few days. The respondent said that it would not have to be taken out, but the bank book would be lodged in the court as bail. McKenna then told respondent where the bank book could be found, and to go to McHugh and tell him to get it. Shortly thereafter the respondent again appeared in the jail with the bank book in his possession and some withdrawal slips. Upon this occasion the respondent requested McKenna to put his signature to a blank order upon the bank. McKenna again told the respondent that if the money had to be taken out of the bank he would not sign the slip. Respondent said it would not have to be taken out, but the withdrawal slip would have to be signed, and, together with the book, left with the court, so that the money could be withdrawn if defendant should run away. McKenna thereupon put his signature to the slip. When he wanted to fill in the necessary written portion, the respondent told him to put only his signature there, and the judge would do the rest. The slip having been signed in blank, it was handed over to the respondent, who afterwards filled it out by inserting the date, the number of the bank book, and $700. The respondent presented the book and slip to the Union Dime Savings Bank and received the money thereon from the bank. He deposited $300 of that sum with the clerk of the court, the bail having been reduced to that sum, and McKenna was liberated the same afternoon. On March 18th the proceeding was adjourned to the 22d. On the morning of that date the respondent appeared before the magistrate, put in a plea of guilty to the charge, and the magistrate imposed a fine of $10, which McKenna paid. On the afternoon of the same day McKenna met the respondent at his office and accompanied him to the office of the city chamberlain. There a check for $300 was drawn to the order of McKenna. Respondent induced McKenna to indorse said check and to hand it over to him, saying that McKenna could not get the money on the check because he was not known at the bank. This check represented the $300 cash

bail. McKenna did not know what the check was for, or to whom it had been drawn, or what the purpose was of obtaining it, but indorsed his name at respondent's request. Respondent also indorsed it and received the proceeds thereof.

McKenna down to this time had no knowledge of the fact that the $700 had been drawn out of the bank, and after the visit to the chamberlain's office he went back to the respondent's office to get his bank book, and was told by the respondent that he would meet him that evening at a certain restaurant. McKenna went to the restaurant as directed, saw the respondent enter, and was told to wait outside, and that the respondent would see him in a few minutes. McKenna, after having waited a long while, finally received word through Houston, the respondent's man, that the respondent had gone to a certain club, and that he (Houston) would meet McKenna the next morning at 10 o'clock at the restaurant and take him to the respondent's office. The next morning, March 23d, Houston met McKenna and took him to the White Star Line, where Houston bought a ticket for McKenna for Liverpool on the steamer Lapland, which was to sail on the next day, paying therefor $39.25. Houston did not deliver the ticket to McKenna, but took him back to the respondent's office, where he waited until 3 that afternoon, and was finally told that the respondent could not see him that day, but would see him at his office the next morning at 9 o'clock. March 24th was the day that McKenna was to sail on the Lapland, which was scheduled to sail at noon. At 9 o'clock in the morning McKenna went to the respondent's office, and was there told by Houston that the respondent was in the Fifty-Fourth Street court. Houston and McKenna thereupon went to that court and met the respondent outside on the sidewalk. The respondent stated that he was busy trying a case, gave Houston McKenna's bank book, and then said that he would meet McKenna at the restaurant as soon as he got through with his case. Houston took the bank book, and with McKenna went to the bank, where for the first time since he had delivered the bank book to the respondent he examined it and found that $700 had been withdrawn. Upon calling Houston's attention to it, the latter said that it was all right, that the balance should be drawn out, and that the respondent would see about it. Houston then induced McKenna to sign, and he did sign, another withdrawal slip for the balance of the money in the account, to wit, $120. Houston took that slip and the bank book, obtained the $120 thereon, and put the same in his pocket. McKenna, accompanied by Houston, then went to the restaurant, where the respondent had promised to meet them, but the respondent did not appear. They waited until half past 11, the boat being scheduled to sail at 12, and then Houston said that he just had a telephone message from the respondent that he would meet them at the pier. Thereupon Houston, McKenna, and McKenna's friend, Kirwan, took a taxicab, which was driven by McHugh and went to the White Star pier. They all waited at the pier until half past 1 in the afternoon—the sailing of the boat having been delayed—but the respondent did not appear. The driver of the taxicab demanded his fare, and thereupon Houston gave McKenna $115 out of the $120 that

had been withdrawn from the bank, keeping $5 for himself. McKenna arranged with the White Star Line office to cancel his passage on the Lapland, and was told that he could sail on the next boat the following Saturday. Houston advised McKenna to sail on the Lapland without his money, saying that the respondent would forward the money to him in Ireland if he would leave his address; but this McKenna declined to do. On the 24th and 25th of March McKenna made various unsuccessful attempts to see the respondent. On March 26th he finally saw him in his office, and respondent then for the first time made the claim that he would keep $600 out of the money as his fee. McKenna objected, and claimed that the payment of $25 was all that was coming to the respondent. The latter then suggested to meet him at Kirwan's office the next morning shortly after 9 o'clock. That was Saturday morning, March 27th, on which day McKenna was to sail. At about the suggested time the respondent, McKenna, and Kirwan met, and then all three went to a restaurant, and there the respondent offered to give McKenna $100. He said that even that amount was not coming to McKenna, but that he would pay it, which, together with the $100 which Houston had handed over, would give McKenna $200, and with that he should go home to Ireland. McKenna declined to accept the $100 and thereafter made his complaint to the Bar Association.

The respondent's story is that McKenna agreed to pay for his services the sum of $500, and to insure payment thereof signed a withdrawal slip against his account in the Union Dime Savings Bank, gave it to the respondent, together with the bank book, and authorized the respondent to fill out the receipt for enough to cover the respondent's fee as agreed upon, plus such further sum as would be required to be deposited as cash bail; that the respondent, having been informed by the clerk that $200 was the usual sum required for bail, filled in the withdrawal receipt for $700; that eventually he had to and did deposit as bail $300 with the clerk and got the clerk's receipt for it; and that he gave the said receipt to McKenna and explained to him that the latter owed respondent $100 on account thereof, as it was advanced out of respondent's $500. McKenna positively denied ever having agreed to pay the respondent $500 for his services. The result of this transaction is that, having been retained to defend McKenna upon a charge of disorderly conduct, to which he pleaded guilty and upon which he was fined $10, the respondent obtained McKenna's bank book and has retained from the $820 represented thereby, plus the $25 received by him as a fee, $688.75. The learned referee has also found that the respondent attempted, after this proceeding had been instituted and a reference ordered, to induce McKenna to proceed beyond the jurisdiction of the court.

Upon a careful examination of the testimony and exhibits, we approve of the conclusion reached by the learned official referee. The respondent received a payment of a fee for $25 from McKenna, then in custody upon a charge of disorderly conduct. Finding that he had money in a savings bank and was about to return to Ireland, by misrepresentations and deceit he obtained and retained for himself almost

all of the man's savings.   His claim of an agreement to pay a fee of $500 is unsupported by the evidence, and upon a basis of a quantum meruit is grossly excessive.   His whole conduct as briefly outlined above shows a purpose and design to appropriate the bulk of his client's savings, to avoid a settlement, and to hurry McKenna out of the country as rapidly as possible.   There is no place in an honorable and learned profession for one who commits, as the referee has found, such gross professional misconduct.

The respondent is therefore disbarred.   All concur.